**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lucrecia Rivas Valenzuela, et al., | No. CV-16-03072-PHX-DGC |
| Plaintiffs, | **ORDER** |
| v. | |
| Doug Ducey, et al., | |
| Defendants. | |

This class action challenges Arizona's policy of denying driver's licenses, or requiring additional documentation before issuing licenses, to noncitizens with federally issued Employment Authorization Documents ("EADs") containing the code "(c)(14)." On December 6, 2017, the Court certified the following class under Rule 23(b)(2) of the Federal Rules of Civil Procedure:

> All noncitizens holding [EADs] coded (c)(14) who are being denied or will be denied the ability to present their EADs alone as sufficient proof of federally authorized presence in order to obtain an Arizona driver's license, as a result of Defendants' 2013 and 2017 policies and related practices pursuant to Executive Order 2012-06, Arizona Department of Transportation (ADOT) Policy 16.1.4, and ADOT Policy 16.1.4's implementation.

Doc. 153 at 14.

Defendants have filed a motion to amend the class definition (Doc. 155), and the parties have filed cross-motions for summary judgment (Docs. 157, 165). The motions are fully briefed, and the Court heard oral argument on June 13, 2018. Doc. 191. For reasons that follow, the Court will deny the motion to amend, grant Defendants' motion for summary judgment on behalf of Governor Ducey, grant Plaintiffs' motion for summary judgment, and enter a permanent injunction.

## I. Background.

### A. History of Defendants' Policy Changes.

Arizona law allows noncitizens to obtain driver's licenses by presenting "proof satisfactory to [Arizona Department of Transportation ("ADOT")] that the applicant's presence in the United States is authorized under federal law." A.R.S. § 28-3153(D). ADOT Policy 16.1.4, which will be referred to in this Order as "the Policy," explains how noncitizens can show authorized presence and obtain licenses. Before June 2012, the Policy provided that noncitizens could obtain driver's licenses by presenting any federally issued EAD, with any code.

In June 2012, the Secretary of the Department of Homeland Security ("DHS") issued a memorandum announcing the Deferred Action for Childhood Arrivals ("DACA") program. *See* Memorandum from DHS Secretary Napolitano, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012). Deferred action is a discretionary decision by DHS to defer removing an individual from the United States. *Id.* The DACA program granted deferred action to noncitizens brought to the United States as children, allowing them to remain in the country for renewable two-year periods if they satisfied certain conditions. *Id.* DACA recipients can apply to work in the United States. *Id.* If approved, they receive EADs coded "(c)(33)."

Arizona Governor Janice Brewer took exception to the DACA program. In August 2012, she issued Executive Order 2012-06 (the "Executive Order"), expressing Arizona's view that the "issuance of Deferred Action or Deferred Action employment

authorization documents to unlawfully present aliens does not confer upon them any lawful or authorized status and does not entitle them to any additional public benefit." Doc. 189 at 4-5. In other words, the Governor concluded that the DHS announcement did not mean that DACA recipients were authorized to be present in the United States under federal law. She directed Arizona agencies, including ADOT, to "conduct a full statutory, rule-making and policy analysis and, to the extent not prohibited by state or federal law, initiate operational, policy, rule and statutory changes necessary to prevent Deferred Action recipients from obtaining eligibility, beyond those available to any person regardless of lawful status, for any taxpayer-funded public benefits and state identification, including a driver's license[.]" *Id.* at 4.

In September 2012, ADOT changed the Policy. Doc. 125-3. Although ADOT previously had permitted all persons with federally issued EADs to obtain driver's licenses – apparently because it deemed the EADs to be sufficient proof of authorized presence in the United States – the new Policy announced that EADs issued to DACA recipients were not sufficient to prove authorized presence. *Id.*

In November 2012, a group of DACA recipients and the Arizona Dream Act Coalition brought suit challenging the denial of driver's licenses. *Ariz. Dream Act Coal. v. Brewer*, Case No. 12-CV-02546-PHX-DGC. This Court granted ultimately summary judgment to the plaintiffs, finding that denying licenses to DACA recipients when all other EAD holders were allowed to obtain licenses violated the Equal Protection Clause. *Ariz. Dream Act Coal. v. Brewer*, 81 F. Supp. 3d 795 (D. Ariz. 2015). The Ninth Circuit affirmed, but on different grounds. *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 1279 (2018). It held that the revised Policy violated the Supremacy Clause because it "encroache[d] on the exclusive federal authority to create immigration classifications" and was therefore displaced by the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, et seq. *Id.* at 971.

During the course of the *Dream Act* case, the Court issued an order finding that the DACA recipients were likely to prevail on their equal protection claim. The Court noted

that ADOT denied licenses to DACA recipients with the (c)(33) category while granting

licenses to other deferred action recipients, including those with the (c)(14) category:

> Defendants have identified nothing about the (c)(33) category code to
> suggest that DACA recipients are somehow less authorized to be present in
> the United States than are other deferred action recipients. Nor have
> Defendants shown that the DHHS policy is based on DACA recipients
> being less authorized. All deferred action recipients are permitted to
> remain in the country without removal for a temporary period of time[.]

*Arizona Dream Act Coal. v. Brewer*, 945 F. Supp. 2d 1049, 1061 (D. Ariz. 2013). After

this order was issued, ADOT changed the Policy to deny licenses not only to deferred

action recipients with EAD category (c)(33), but also to those with categories (c)(14) and

(a)(11). Doc. 158-1 at 71-74. EADs coded (c)(14) are issued to individuals who receive

deferred action treatment outside of the DACA program. *See* 8 C.F.R. § 274(c)(14).

EADs coded (a)(11) are issued to recipients of deferred enforced departure. *See* 8 C.F.R.

§ 274(a)(11).

ADOT's director, John Halikowski, testified that this 2013 Policy change relied on

a three-part test created by ADOT to determine whether an individual has authorized

presence in the United States for purposes of § 28-3153(D). Doc. 189 at 51. That test

asks whether the individual (1) has formal immigration status, (2) is on a path to

obtaining formal immigration status, or (3) has sought or been granted relief specifically

authorized by the INA. *Id.* at 46, 87. Director Halikowski testified that he began

formulating this test in 2012 and finalized it in 2013. *Id.* at 46-47.

In December 2014, following the final orders of this Court and the Ninth Circuit in

the *Dream Act* case, ADOT changed its Policy to accept EADs from DACA recipients.

But the Policy continued to deny licenses to noncitizens with (c)(14) and (a)(11) EADs.

*See* Doc. 158-1 at 76-79.

In January 2015, Plaintiff Marcos Gonzalez presented his (c)(14) EAD at a Motor

Vehicle Division ("MVD") location and was denied a license. Doc. 189 at 82, 167. He

contacted his attorneys, and they sent a letter to Director Halikowski and Governor

Ducey in April 2015. *Id.* at 82-84, 168. The letter stated that Mr. Gonzalez received deferred action as a relative of a domestic violence survivor. *Id.* at 83. Director Halikowski responded that ADOT would issue Mr. Gonzalez a license because it appeared that he was a derivative beneficiary of a self-petitioner under the Violence Against Women Act ("VAWA"). *Id.* at 85. Mr. Gonzalez was issued a license in June 2015 (*id.* at 168), but no change was made to the Policy. When Mr. Gonzalez returned to the MVD to renew his license in February 2016, the license was denied. *Id.* at 168.

Plaintiffs brought this lawsuit in September 2016, challenging the denial of licenses to noncitizens with EADs coded (c)(14) and (a)(11). Doc. 1. The following month, Defendants' counsel sent a letter to Plaintiffs' counsel explaining that each of the named plaintiffs was eligible for a license under Defendants' existing policy. Doc. 189 at 86-89. The letter stated that VAWA derivative beneficiaries (like Mr. Gonzalez) were eligible because "immigration relief as a VAWA derivative is expressly provided for under the INA[,]" and U-visa applicants awaiting the availability of a visa (like the remaining named plaintiffs) were eligible because they are "on a path to obtaining a formal immigration status" and they seek relief "expressly provided for under the INA." *Id.* at 87-88. No update was made to the Policy at that time.

On January 20, 2017, the Court held a hearing in this case on Plaintiffs' motion for a preliminary injunction. Doc. 55. Counsel for Defendants asserted that each of the Plaintiffs could obtain driver's licenses by presenting additional documentation. But when the Court asked defense counsel where this ADOT policy could be found – where it had been made public in any form – counsel was unable to identify a public statement of the policy. *See* Doc. 59 at 11-12. A few weeks later, in February 2017, ADOT changed the Policy to provide that certain categories of (c)(14) EAD holders – categories that correspond precisely to the Plaintiffs in this case – could obtain licenses by presenting additional documents. *See* Doc. 187 ¶ 21; Doc. 158-1 at 86-89. The Policy continued to state that holders of (a)(11) EADs cannot receive licenses.

Given this history, the Court concludes that ADOT's policy changes have been made either because of Governor Brewer's disagreement with the federal government's DACA program or in an effort to defend the resulting policy in court. As noted, ADOT long accepted deferred action EADs as sufficient proof of authorized presence in the United States for purposes of A.R.S. § 28-3153(D). ADOT changed this policy and denied licenses only to DACA recipients after Governor Brewer issued her Executive Order. Once this Court noted in the *Dream Act* case that equal protection problems arise from denying licenses to some deferred action recipients while granting them to others, ADOT changed its policy to add (c)(14) and (a)(11) EADs to the ban that already applied to DACA recipients. This change allowed ADOT to argue, as it later did, that DACA recipients were not the only deferred action recipients who were denied licenses.

ADOT changed its policy with respect to DACA recipients when ordered to do so in the *Dream Act* case, but left in place the ban on (c)(14) and (a)(11) recipients – that is, until this lawsuit was filed. When Plaintiffs brought this case, ADOT argued that they had no injury because they could obtain licenses by presenting additional documents. This assertion, however, was not supported by any change to the Policy. Only after this Court questioned defense counsel on where the alleged policy could be found did ADOT formally amend the Policy. Again, it appears that ADOT changed its policy to bolster its defense in court.

ADOT disputes that the 2017 change was a change at all, instead characterizing it as a "clarification" of already existing policies. *See* Doc. 125-13 at 17; Doc. 187 ¶¶ 21-22. But Defendants had no written policy regarding the availability of licenses to (c)(14) holders until the 2017 changes, and Director Halikowski testified that he did not know whether *any* ADOT employee other than himself was aware that (c)(14) holders might be eligible before those changes. Doc. 189 at 70-71. Indeed, Defendants can identify no person holding a (c)(14) EAD who was granted a license between September 2013 and February 2017 other than Mr. Gonzalez, who received a license only after his lawyer contacted the agency. What is more, ADOT's Rule 30(b)(6) witness,

Madelene Carbajal, testified that persons holding (c)(14) EADs between the 2013 and 2017 Policy changes would have been turned away at the MVD's greeter station, and that the issuance of Mr. Gonzalez's license in 2015 violated the Policy. Doc. 176-2 at 19-22, 25-27, 34; *see also* Doc. 184 at 4 n.4.

### B. Additional Background.

The February 2017 version of the Policy states that holders of (c)(14) EADs "may be eligible" if they are a derivative of a self-petitioner under VAWA or have a pending application for a visa or change of immigration status. Doc. 158-1 at 94. It further states:

Documents sufficient to establish authorized presence may include:

1. Form I-797 Notice of Action that identifies the EAC holder as a derivative child named in a Form I-360, Petition for Amerasian, Widow(er) or Special Immigrant.

2. Form I-918 Petition for U Nonimmigrant Status (U Visa) that has been received by [the U.S. Citizenship and Immigration Services ("USCIS")].

Doc. 158-1 at 89. In July 2017, ADOT amended the Policy to add that "[a]n original form I-797 may be accepted when the receipt and/or case number is redacted." Doc. 158-1 at 94 (emphasis omitted). The February and July 2017 versions are otherwise identical. *See* Doc. 158-1 at 86-89, 91-94.

The named plaintiffs are noncitizen residents of Arizona who have deferred action designations and have been issued (c)(14) EADs from USCIS, which authorize them to remain and work in the United States. Of the six named plaintiffs, one is a VAWA derivative beneficiary, three have pending U-visa applications, and two have been granted U visas. Three named plaintiffs – Marcos Gonzalez, Maria Aceituno Lopez, and Araceli Franco Gonzalez – continue to hold (c)(14) EADs and have attempted to obtain licenses using their (c)(14) EADs (and, in some instances, additional documents) at an MVD location.

Plaintiffs represent a class of all (c)(14) EAD holders. When the Court certified the class, it declined to include (a)(11) holders because no named plaintiffs held an (a)(11) EAD. Doc. 153. Plaintiffs challenge ADOT and MVD policies and practices which require them to present documentation in addition to their EADs to prove authorized presence. Plaintiffs assert that the policies violate the Equal Protection and Supremacy Clauses of the U.S. Constitution. Doc. 93 ¶¶ 61-85. Plaintiffs seek declaratory and injunctive relief prohibiting Defendants from enforcing the challenged policies. *Id.* ¶¶ 85(A)-(E).

Defendants argue that the Court should narrow the class definition to exclude certain (c)(14) EAD holders who suffer a different injury from Plaintiffs. Doc. 155. Defendants also argue that they are entitled to summary judgment because the claims against the Governor are barred by sovereign immunity, and the claims against the remaining defendants fail on the merits. Doc. 157. Plaintiffs assert that they are entitled to summary judgment, a permanent injunction, and declaratory relief. Doc. 165.

## II. Motion to Amend the Class Definition.

Defendants seek to narrow the class definition to (c)(14) EAD holders who are VAWA derivative beneficiaries and U-visa applicants. Defendants argue that including all (c)(14) EAD holders in the class is improper because they are not all treated alike. The named plaintiffs may obtain licenses by providing additional documents, but, Defendants assert, other (c)(14) EAD holders cannot obtain licenses. Doc. 155. Defendants argue that the named plaintiffs cannot represent these other (c)(14) holders because they suffer a distinct injury.

Defendants ask the Court to modify the class definition by adding the following italicized language:

> All noncitizens holding [EADs] coded (c)(14) *by receiving relief under either the Violence Against Women Act (VAWA) or Unonimmigrant visa (U-visa) programs* who are being denied or will be denied the ability to present their EADs alone as sufficient proof of federally authorized presence in order to obtain an Arizona driver's license, as a result of Defendants' 2013 and 2017 policies and related practices pursuant to

- 8 -

Executive Order 2012-06, Arizona Department of Transportation (ADOT) Policy 16.1.4, and ADOT Policy 16.1.4's implementation.

Doc. 155 at 2 (emphasis added).

The distinction drawn by Defendants among (c)(14) holders appears designed solely for litigation purposes – to defeat the named plaintiffs' claims for want of injury, or to narrow the class as much as possible. Defendants assert that (c)(14) EADs are granted to two broad categories: individuals who are eligible for deferred action pursuant to specific statutory programs establishing eligibility criteria, and individuals who are granted deferred action on a case-by-case basis pursuant to USCIS's sole discretion. Doc. 155 at 4-5. Defendants refer to the latter category as recipients of "regular" deferred action. *Id.* Defendants describe these individuals as having received deferred action "without applying for or receiving relief through any particular program (like the VAWA or U-visa programs)." *Id.* at 5-6. It is these regular deferred action recipients who are barred from obtaining licenses under Defendants' current policies.

The problem with this distinction is that it does not comport with reality. Some members of the class hold (c)(14) EADs under statutory programs other than the VAWA and U-visa programs. Defendants themselves identify three statutory programs under which an individual could be granted deferred action and a (c)(14) EAD:

- Immediate family members of lawful permanent residents ("LPRs") killed by terrorism pursuant to USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361

- Immediate family members of LPRs killed in combat and granted posthumous citizenship pursuant to National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1703(c)-(d), 117 Stat. 1392, 1694-95

- [T visa] applicants while application is pending pursuant to 8 U.S.C. § 1227(d)(2)

Doc. 155 at 4 (citing *Texas v. United States*, 787 F.3d 733, 759 n.78 (5th Cir. 2015)).

The existence of these other statutory programs disproves Defendants' argument that the class can be neatly divided between the named plaintiffs and "regular" deferred action recipients who receive their status on an individual, discretionary basis. And Defendants do not explain why (c)(14) holders under other statutory programs should be excluded from the class; they simply assert that Plaintiffs should be permitted to represent only individuals who have been granted relief under the same programs as Plaintiffs. Doc. 155 at 7. Defendants do not identify any actual distinctions between the various programs or the harms suffered by members of the programs. Indeed, the only evident distinction among (c)(14) EAD holders is the one Defendants created by altering their policies after Plaintiffs initiated this suit.

Plaintiffs argue that there is no material distinction among any of the (c)(14) EAD holders, that Defendants should not be permitted to "modif[y] their Policy just enough to try to moot" the claims of the named plaintiffs, and that even with the most recent changes Defendants' policies violate "the same constitutional principles and rel[y] on the same flawed legal theory for all (c)(14) EAD holders." Doc. 175 at 7-9. The Court agrees. Plaintiffs are all (c)(14) EAD holders.[1] Each was granted deferred action and authorization to work in the United States. Under Defendants' policies, (c)(14) EAD holders – whether denied a license altogether or denied a license unless they present additional documents – are being treated differently than all other EAD holders. And Defendants' policy with respect to all (c)(14) EAD holders allegedly is derived from a shared underlying rationale: ADOT's three-part test for determining authorized presence.

---

[1] During the course of this suit, U visas became available for two of the named plaintiffs. Those plaintiffs now have U visas and EADs coded (a)(19), and therefore do not have claims. Additionally, named plaintiff Maria Del Carmen Palafox Marquez has never attempted to obtain a license and therefore has no claim. As explained in the Court's certification order, however, the remaining named plaintiffs are members of the class with typical claims because all are Arizona residents who at some point "were told by an MVD employee that their EAD alone was insufficient, and all continue to hold (c)(14) EADs which they plan to renew until their status changes at some future date." Doc. 153 at 11-12. The terms "Plaintiff" and "Plaintiffs" in the remainder of this Order refer to these three individuals as representatives of the class.

These factual differences among class members do not warrant a change to the class definition. Each class member shares a common legal issue: the constitutionality of Defendants' (c)(14) policy. *See Rodriguez v. Hayes*, 591 F.3d 1105, 1122-26 (9th Cir. 2010) (finding the Rule 23 requirements satisfied where plaintiffs challenged their extended detentions without bond hearings pending removal or admissibility determinations despite defendants' objection that "class members suffer detention for different reasons and under the authority of different statutes" because "the constitutional issue at the heart of each class member's claim for relief is common"). As persons subject to the challenged policy, the named Plaintiffs have claims typical of the class despite the differing bases under which each class member obtained a (c)(14) EAD. *See id.* at 1124 (finding the sole named plaintiff to have a typical claim despite being detained pursuant to only one of the challenged statutes). There is no conflict among class members' interests, and no one disputes the qualifications of Plaintiffs' counsel. *Id.* Finally, a class under Rule 23(b)(2) is appropriate because Plaintiffs "seek uniform relief from a practice applicable to all of them," *id.* at 1125, and "a single injunction or declaratory judgment would provide relief to each member of the class[,]" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011).

Defendants argue that (c)(14) EAD holders who have been granted "regular" deferred action must be excluded because they cannot get licenses and therefore suffer a distinct injury from other (c)(14) EAD holders. In support, Defendants compare regular deferred action recipients to recipients of deferred enforced departure, who receive EADs coded (a)(11). The Court has two problems with this comparison. First, the Court denied class certification for (a)(11) EAD holders in part because there was no plaintiff in this case with such an EAD. The circumstances for (c)(14) EAD holders are different – each Plaintiff possesses a (c)(14) EAD, and Defendants' policy singles out all (c)(14) EAD holders for some form of different treatment. Second, the distinction among (c)(14) EAD holders is one entirely of Defendants' creation, after this lawsuit was filed. Defendants provide no policy rationale for the distinction. They make no attempt to argue that the

presence of (c)(14) EAD holders outside the VAWA and U-visa programs is somehow less "authorized under federal law" for purposes of A.R.S. § 28-3153(D). Defendants' new distinction appears to have been created solely in an effort to moot Plaintiffs' claims or narrow the class in this litigation. The Court cannot conclude that changes based on such litigation tactics provide a legitimate ground for subdividing the class. Accepting such maneuvering would permit Defendants to defeat the purposes of Rule 23. *See, e.g.*, *Deposit Guar. Nat'l Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 339 (1980) ("Requiring multiple plaintiffs to bring separate actions, which effectively could be 'picked off' by a defendant's tender of judgment before an affirmative ruling on class certification could be obtained, obviously would frustrate the objectives of class actions"); *Chen v. Allstate Ins. Co.*, 819 F.3d 1136, 1142-43 (9th Cir. 2016) ("[O]ffers to provide full relief to the representative plaintiffs who wish to pursue a class action must be treated specially, lest defendants find an easy way to defeat class relief[,]" and "a named plaintiff's claim is 'transitory in nature and may otherwise evade review' in light of a defendant's tactic of 'picking off' lead plaintiffs to avoid a class action.") (quoting *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1092 (9th Cir. 2011)).

Defendants' motion to amend the class definition will be denied.

**III.    Summary Judgment Standard.**

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Only disputes over facts that might affect the outcome

of the suit will preclude summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**IV.     Sovereign Immunity.**

"The Eleventh Amendment erects a general bar against federal lawsuits brought against a state." *Porter v. Jones*, 319 F.3d 483, 491 (9th Cir. 2003). This bar generally applies to suits against state officials. *Mason v. Arizona*, 260 F. Supp. 2d 807, 817 (D. Ariz. 2003) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984)). The Supreme Court held in *Ex parte Young* that state officials can, in some circumstances, be sued to enjoin violations of federal law. 209 U.S. 123 (1908). This exception to sovereign immunity applies when lawsuits are brought against state officers in their official capacities for an injunction prohibiting future violations of federal law. Such "official-capacity actions for prospective relief are not treated as actions against the State" for purposes of the Eleventh Amendment. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989) (internal quotation marks omitted).

For the *Ex Parte Young* exception to apply, the state officer "must have some connection with the enforcement of the act" to be enjoined. 209 U.S. at 157. The connection "must be fairly direct; a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit." *Coal. to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012) (quoting *L.A. Cty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992)); *Sweat v. Hull*, 200 F. Supp. 2d 1162, 1167 (D. Ariz. 2001). As a result, courts generally hold that governors do not fall within the *Ex Parte Young* exception by virtue of their general state supervisory and administrative powers. *See Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 846-47 (9th Cir. 2002); *NAACP v. L.A. Unified Sch. Dist.*, 714 F.2d 946, 953 (9th Cir. 1983); *Sweat*, 200 F. Supp. 2d at 1173-76.

Governor Ducey argues that Plaintiffs cannot establish the requisite connection between his actions and ADOT's policy regarding (c)(14) EADs. Doc. 157 at 3-6.

- 13 -

Plaintiffs assert that the Executive Order issued by Governor Ducey's predecessor, which is still in effect, provides a direct link. Doc. 165-1 at 36-39. The Court is not persuaded.

Because the Executive Order declares that a deferred action designation does not confer authorized presence on the recipient, the 2013 Policy, which denied (c)(14) EAD holders licenses altogether, could be viewed as a logical result of the Executive Order. But the two most recent updates do not deny licenses to (c)(14) EAD holders – they permit licenses on presentation of additional documents. The 2017 Policy changes clearly were not caused by the Executive Order's directive to "initiate operational, policy, rule and statutory changes necessary to prevent Deferred Action recipients from obtaining . . . a driver's license." Plaintiffs point to no other language in the Executive Order that could be interpreted to mandate ADOT's current policy.

Nor do Plaintiffs submit evidence that Director Halikowski and ADOT were in fact responding to the Executive Order when they issued the 2013 Policy changes. Plaintiffs cite notes from an August 2012 ADOT meeting discussing what action to take in response to DACA and the Executive Order. *See* Doc. 189 at 42-43. The notes make clear that ADOT believed a policy of denying licenses to DACA recipients would strictly adhere to the Executive Order, but there is no suggestion that ADOT believed the Executive Order required it to deny licenses to (c)(14) EAD holders. Moreover, according to testimony from a representative of former Governor Brewer in the *Dream Act* case, the Executive Order was aimed solely at DACA recipients. *See* Doc. 189 at 231, 234, 246, 255.

Director Halikowski testified that in making the 2013 changes to the Policy, ADOT relied on the three-part test discussed above. Doc. 189 at 51. Plaintiffs point to no evidence that the test is mandated by the Executive Order or that the Governor's office was involved in formulating it. *See* Doc. 189 at 300 (former MVD director testified that ADOT generally does not consult the Governor's office when it makes changes to its policies, including Policy 16.1.4); Doc. 158-2 at 82 (representative of Governor Ducey's

office testified that no one in the office reviewed the three-part test because this authority is delegated to ADOT).

In short, the policy changes from 2013 forward do not appear to have resulted from the Executive Order, and Plaintiffs provide no evidence of any other involvement in the policy changes by the Governor's office. Thus, even construing the evidence in the light most favorable to Plaintiffs, it does not show that the Governor or the Executive Order required ADOT to declare that (c)(14) EAD holders are ineligible for licenses (or eligible if they present additional documents).

Governor Ducey's general duty to enforce Arizona law, and his general oversight of ADOT, are not sufficient to connect him to the enforcement of ADOT's policy with respect to (c)(14) EAD holders. *See Coal. to Defend Affirmative Action*, 674 F.3d at 1134. Were the law otherwise, "[g]overnors who influence state executive branch policies (which virtually all governors do) would always be subject to suit under *Ex parte Young*. The exception would become the rule." *Tohono O'odham Nation v. Ducey*, 130 F. Supp. 3d 1301, 1309-11 (D. Ariz. 2015). The Court will grant summary judgment in favor of Governor Ducey.

## V. Supremacy Clause.

"The Supremacy Clause provides a clear rule that federal law 'shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'" *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting U.S. Const. art. VI, cl. 2). Under this clause, "Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).

The preemption doctrine consists of three well-recognized classes: express, field, and conflict preemption. *Arizona*, 567 U.S. at 399. Express preemption occurs when Congress "withdraw[s] specified powers from the States by enacting a statute containing an express preemption provision." *Id.* (citing *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 588-90 (2011)). Field preemption precludes states "from regulating

conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Id.* (citing *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 115 (1992)). Conflict preemption occurs "where compliance with both federal and state regulations is a physical impossibility," and "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal citations and quotation marks omitted). In resolving preemption challenges to state laws, "courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Id.* at 400 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

Plaintiffs' third amended complaint asserts that Defendants' classification of (c)(14) EAD holders according to their three-part test for federally authorized presence constitutes "impermissible state regulation of immigration." Doc. 93 ¶ 70. Specifically, Plaintiffs assert that the three-part test and the implementing policies "conflict[] with, frustrate[], and serve[] as an obstacle to federal immigration law, goals, and policies by, inter alia, creating a new, state-based classification of noncitizens that treats deferred action recipients as though they are not authorized by federal law to be present in the United States[.]" Doc. 93 ¶ 69.

Defendants assert that federal law expressly empowers states to regulate state-issued benefits such as driver's licenses, and that their policies do not regulate immigration or conflict with federal law. Doc. 157 at 6-13. Defendants' argument is foreclosed by the Ninth Circuit's final decision in the *Dream Act* case. 855 F.3d 957. Although the policy at issue in that case was slightly different – it denied licenses to deferred action recipients under the DACA program with EADs coded (c)(33) – the Ninth Circuit's rationale for finding the policy preempted applies with equal force in this case. The court of appeals explained that "States enjoy no power with respect to the classification of aliens," *id.* at 971 (quoting *Plyler v. Doe*, 457 U.S. 202, 225 (1982)), and "'neither a clear encroachment on exclusive federal power to admit aliens nor a clear

- 16 -

conflict with a specific congressional purpose' is required in order for federal law to preempt state regulations of immigrants," *id.* at 972 (quoting *Toll v. Moreno*, 458 U.S. 1, 10 (1982)).

Applying these principles to the policy at issue in the *Dream Act* case, the Ninth Circuit explained:

> Arizona prohibits the issuance of drivers' licenses to anyone who does not submit proof that his or her presence in the United States is "authorized under federal law," Ariz. Rev. Stat. § 28-3153(D), and then purports to create its own independent definition of "authorized under federal law," one that excludes DACA beneficiaries. Because Arizona created a new immigration classification when it adopted its policy regarding driver's license eligibility, it impermissibly strayed into an exclusive domain that Congress, through the INA, delegated to the executive branch.

> * * *

> Arizona points to three criteria to justify treating EAD recipients differently than individuals with (c)(9) and (c)(10) EADs[2], even though the federal government treats their EADs the same in all relevant respects. But Arizona's three criteria – that an applicant: has formal status; is on a path to formal status; or has applied for relief expressly provided for in the INA – cannot be equated with "authorized presence" under federal law. DACA recipients and noncitizens with (c)(9) and (c)(10) EADs all lack formal immigration status, yet the federal government permits them to live and work in the country for an undefined period of time, provided they comply with certain conditions.

> Arizona thus distinguishes between noncitizens based on its own definition of "authorized presence," one that neither mirrors nor borrows from the federal immigration classification scheme. And by arranging federal classifications in the way it prefers, Arizona impermissibly assumes the federal prerogative of creating immigration classifications according to its own design, thereby engaging in an "exercise of regulatory bricolage," [*Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1072 (9th Cir. 2014)] (Christen, J., concurring), despite the fact that "States enjoy no power with

---

[2] EADs coded (c)(9) are granted to individuals who have petitioned for adjustment of status, and EADs coded (c)(10) are granted to individuals who have received cancellation of removal. *See* 8 C.F.R. § 274a.12(c)(9)-(10).

respect to the classification of aliens," *Plyler*, 457 U.S. at 225, 102 S. Ct. 2382.

*Id.* at 972-74.

In their most recent iteration of the Policy, Defendants conclude that some (c)(14) EAD holders lack a "federally authorized presence" while others do not. Defendants purport to grant driver's licenses only to (c)(14) EAD holders who are VAWA derivative beneficiaries or have pending U-visa applications, and who present documents verifying this status. As the Ninth Circuit noted above, however, the federal government makes no such distinction. It recognizes all (c)(14) deferred action recipients – and other noncitizens who lack formal immigration status, such as (c)(9) and (c)(10) EAD holders – as authorized "to live and work in the country for an undefined period of time, provided they comply with certain conditions." *Id*. at 973.

Importantly, Defendants' most recent (c)(14) policy purports to be based on the same three-part test as the former (c)(33) policy – the test the Ninth Circuit held "cannot be equated with 'authorized presence' under federal law." *Id.* Defendants point to no fact that would make the three-part test more appropriate when applied to (c)(14) EAD holders than to (c)(33) EAD holders. Thus, as in the *Dream Act* case, Defendants' policy "necessarily embodies the State's independent judgment that [certain recipients of deferred action] are not 'authorized' to be present in the United States 'under federal law.'" *Id.* at 973. Arizona may not impose discriminatory burdens on (c)(14) deferred action recipients on the basis of its independent judgment, untethered to the federal classification scheme, that certain (c)(14) holders are not authorized to be present in the United States.[3]

---

[3] Plaintiffs argue in their reply brief that the Court should apply the doctrine of collateral estoppel to preclude Defendants from relitigating this issue because it was decided in the *Dream Act* case. Doc. 184 at 2-3. The Court will not consider arguments raised for the first time in a reply brief. *Gadda v. State Bar of Cal.*, 511 F.3d 933, 937 n.2 (9th Cir. 2007).

Defendants argue that the INA "expressly authorizes the determination at issue here." Doc. 157 at 7. They cite 8 U.S.C. § 1622(a), which authorizes states "to determine the eligibility for any State public benefits of an alien who is a qualified alien (as defined in section 1641 of this title), [or] a nonimmigrant under the [INA.]" *Id.* According to Defendants, noncitizens under the VAWA program are "qualified aliens" and "immigrants," and noncitizens under the U-visa program are "nonimmigrants" within the meaning of this statute. *Id.* Therefore, "ADOT's Policy incorporates these federal classifications by providing that proof of one's status under the VAWA or U-visa programs can establish authorized presence under federal law." *Id.*

Plaintiffs respond that the statute cited by Defendants, passed by Congress to create a "national policy with respect to welfare and immigration," *see* 8 U.S.C. § 1601, has nothing to do with driver's licenses and, even if it did, Defendants' license policies do not borrow from this statute's definitions. Doc. 165-1 at 20. The Court agrees. Even if a driver's license falls within the definition of a "State public benefit," there is no evidence suggesting that Defendants utilized the statute's definitions of "qualified alien" and "nonimmigrant" to guide their (c)(14) policies, other than the general citation to "U.S.C. 8" contained in Policy 16.1.4. Defendants grant licenses to persons who can prove "authorized presence," not persons who can prove they are "nonimmigrants" or "qualified aliens." ADOT's three-part test for determining "authorized presence" does not appear to have any link to § 1621 or these definitions, and Defendants' policies do not require other noncitizens or EAD holders to demonstrate that they are qualified aliens or nonimmigrants within the meaning of the statute.

Moreover, the Ninth Circuit considered and rejected Defendants' argument that § 1622 suggests Congress did not intend to preclude all state regulation of immigration in the *Dream Act* case, explaining:

> we do not conclude that Congress has preempted all state regulations that touch upon immigration. Arizona's policy is preempted because, in determining which aliens shall be eligible to receive a state benefit, Arizona

- 19 -

created new immigration classifications based on its independent view of who is authorized under federal law to be present in the United States.

855 F.3d at 975. In other words, the problem with Defendants' classification scheme is not simply that it refers to immigration classifications, but that it creates classifications with no basis in the federal scheme.

Defendants also characterize Plaintiffs' preemption claim as attacking mere documentary burdens on (c)(14) holders, and argue that these documentary requirements are not classifications. Doc. 157 at 9. But the policy Plaintiffs attack is the three-part test and Defendants' implementation of that test (through ADOT's Policy and MVD policies and practices) with respect to (c)(14) EAD holders. Director Halikowski testified that the (c)(14) policy is based on the three-part test, and that certain EAD holders – although permitted to remain in the country by the federal government – do not "meet the definition that [he] set up for authorized presence under federal law." Doc. 189 at 48-49. Thus, Defendants' (c)(14) policies are based on the very test the Ninth Circuit found preempted in the *Dream Act* case. *See, e.g.*, Doc. 189 at 46, 87, 219-20, 222. Defendants continue to assert the validity of this test. *See, e.g.*, Doc. 189 at 47, 87. But Defendants present no evidence or argument that application of the test to deferred action recipients with (c)(14) EADs is any more appropriate than was its application to deferred action recipients holding (c)(33) EADs. The Court is bound by the Ninth Circuit's decision in the *Dream Act* case. Plaintiffs are entitled to summary judgment on their Supremacy Clause claim.[4]

## VI. Equal Protection.

The Ninth Circuit held in the *Dream Act* case that "[w]hile preemption derives its force from the Supremacy Clause of the Constitution, 'it is treated as 'statutory' for

---

[4] The Court notes that it disagreed – and continues to disagree – with the Ninth Circuit's preemption analysis. *See Ariz. Dream Act Coal. V. Brewer*, 945 F. Supp. 2d 1049, 1056-60 (D. Ariz. 2013). But the Court is bound by the Ninth Circuit's holding in the *Dream Act* case.

purposes of our practice of deciding statutory claims first to avoid unnecessary constitutional adjudications.'" 855 F.3d at 971 (quoting *Douglas v. Seacoast Prods.*, 431 U.S. 265, 271-72 (1977)). "Given the formidable Equal Protection concerns" raised by Arizona's policy, the court instead based its decision on the Supremacy Clause. *Id.* Applying this precedent, the Court declines to reach the merits of Plaintiffs' Equal Protection claim.

**VII.    Remedy.**

Plaintiffs seek (1) a permanent injunction prohibiting Defendants from "implementing or enforcing Arizona's unconstitutional policy and practice of denying deferred action recipients with (c)(14)-coded [EADs] the ability to present their EADs alone to establish authorized presence to qualify for driver's licenses and state identification cards," and (2) a declaration "making it clear that Defendants' policies and practices, including Executive Order 2012-06, ADOT Policy 16.1.4, and Arizona's criteria for federally authorized presence, violate both the Supremacy Clause and the Equal Protection Clause." Doc. 165 at 2.

**A.    Permanent Injunction.**

An injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A plaintiff seeking a permanent injunction must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). "While '[t]he decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court,' the 'traditional principles of equity' demand a fair weighing of the factors listed above, taking into account the unique circumstances of each case." *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 880 (9th Cir. 2014) (quoting *eBay*, 547 U.S. at 391).

### 1. Irreparable Harm and Adequacy of Legal Remedies.

This requirement is easily satisfied under Ninth Circuit law. A deprivation of constitutional rights constitutes irreparable harm. *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"); *Nelson v. Nat'l Aeronautics & Space Admin.*, 530 F.3d 865, 882 (9th Cir. 2008) ("Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm."), *rev'd on other grounds*, 562 U.S. 134 (2011). The Ninth Circuit has applied this principle in preemption cases. *See Am. Trucking Ass'n, Inc. v. City of L.A.*, 559 F.3d 1046, 1058 (9th Cir. 2009) ("[T]he constitutional violation alone, coupled with the damages incurred, can suffice to show irreparable harm. The Supreme Court has implied as much.") (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992)); *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011) (We have "stated that an alleged constitutional infringement will often alone constitute irreparable harm."), *rev'd in part on other grounds*, 567 U.S. 387 (2012); *see also United States v. Arizona*, 703 F. Supp. 2d 980, 1006-07 (D. Ariz. 2010).[5]

### 2. Balance of Hardships and the Public Interest.

In deciding whether to grant a permanent injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief . . . [and] should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quotation marks and citations omitted); *see Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987) (finding that the standards for a permanent

---

[5] The Court questions whether a Supremacy Clause violation can constitute irreparable harm in light of cases suggesting that the Clause does not confer traditional individual rights. *See, e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1383 (2015) ("[T]he Supremacy Clause is not the source of any federal rights[.]" (internal quotation marks omitted)). But the Court, again, is bound by Ninth Circuit law. The Ninth Circuit has held that plaintiffs can obtain injunctive relief on the basis of the Supremacy Clause. *See Indep. Living Ctr. of S. Cal., Inc. v. Shewry*, 543 F.3d 1050, 1061-62 (9th Cir. 2008).

injunction are "essentially the same" as for a preliminary injunction). Addressing these factors with respect to a preliminary injunction in the *Dream Act* case, the Ninth Circuit held:

> [B]y establishing a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction. It is clear that it would not be equitable or in the public's interest to allow the state to violate the requirements of federal law, especially when there are no adequate remedies available. On the contrary, the public interest and the balance of the equities favor prevent[ing] the violation of a party's constitutional rights.

*Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014) (quotation marks and citations omitted).

This reasoning applies here. The government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). And the public has little interest in Defendants continuing a policy that violates the Supremacy Clause.

### 3. Scope of Injunction.

The Ninth Circuit has held that an injunction should be limited to the named plaintiffs unless the court has certified a class. *Zepeda v. I.N.S.*, 753 F.2d 719, 727-28 & n.1 (9th Cir. 1983). Because the Court certified a class of (c)(14) EAD holders under Rule 23 (Doc. 153), the injunction will grant relief to the entire class.

### B. Declaratory Relief.

"Declaratory relief is appropriate '(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Guerra v. Sutton*, 783 F.2d 1371, 1376 (9th Cir. 1986) (quoting *Bilbrey by Bilbrey v. Brown*, 738 F.2d 1462, 1470 (9th Cir. 1984)).

Plaintiffs argue that declaring Defendants' policies unconstitutional "would make it clear once and for all that Defendants' state-created definition of authorized presence is

unconstitutional" and would "prevent Defendants from further shifting their ADOT policies preventing further 'uncertainty, insecurity, and controversy.'" Doc. 165-1 at 31 (quoting *Bilbrey*, 738 F.2d at 1470). Plaintiffs request a declaration that "Defendants' practices and policies, including [the Executive Order], ADOT Policy 16.1.4, and Defendants' state-created criteria for federally authorized presence is unconstitutional because it violates both the Supremacy Clause and the Equal Protection Clause." *Id.* at 31 n.20. Defendants argue that the requested declaration is overbroad because it would provide relief beyond that necessary to resolve the class's harms. Doc. 186 at 19-20.

Given that the Ninth Circuit already instructed Defendants in the *Dream Act* case that their three-part test for authorized presence violates the Supremacy Clause, but Defendants nonetheless continued to rely on the test (and indeed seem to still believe in its validity), the Court agrees with Plaintiffs that declaratory relief will serve a useful purpose in finally putting this issue to rest and giving Plaintiffs relief from the uncertainty that gave rise to the *Dream Act* case and now this case. But the Court also agrees with Defendants that the declaration Plaintiffs request is broader than necessary. Particularly, the declaration should not address the Executive Order or the Governor's office because, as explained above, Plaintiffs have not established a link between the unlawful (c)(14) policy and the Governor or Executive Order. And the declaration will not address the alleged Equal Protection violation because the Court does not reach this issue.

**VIII. Motion to Seal.**

Plaintiffs move to seal portions of their statement of facts in support of summary judgment (Doc. 167), exhibits in support of summary judgment (Doc. 168), Defendants' reply in support of summary judgment and response to Plaintiffs' cross-motion (Doc. 178), and Defendants' response to Plaintiffs' statement of facts (Doc. 179). Doc. 185. The Court entered a stipulated protective order on September 28, 2017, which deemed street addresses, alien identification numbers, social security numbers, dates of birth, copies of EADs, and other personal or identifying information to be "confidential information" subject to filing under seal. Doc. 115. Pursuant to that order, the parties

met and conferred, stipulated to the sealed portions of the documents at issue, and filed redacted versions in the public docket. *See* Docs. 176, 181, 182, 186-89.

The Court has reviewed the stipulations and redacted materials, and is satisfied with the parties' resolution. The submitted materials redact certain sensitive identifying or personal information about Plaintiffs, but leave unredacted Plaintiffs' names and other information that has previously been disclosed in public filings or hearings. The Court will order the sealing of the documents pursuant to the stipulations.

**IT IS ORDERED:**

1. Defendants' motion to amend the class definition (Doc. 155) is **denied**.

2. Defendants' motion for summary judgment (Doc. 157) is **granted** with respect to Governor Ducey and **denied** as to the remaining Defendants.

3. Plaintiffs' motion for summary judgment, declaratory relief, and a permanent injunction (Doc. 165) is **granted**.

4. Plaintiffs' motion to seal (Doc. 185) is **granted**. Pursuant to the parties' stipulations (Docs. 176, 181), the Clerk is directed to file under seal Docs. 167, 168, 178, and 179. The redacted documents attached to the stipulations and filed separately (Docs. 176, 182, 186, 187, 188, 189) shall remain in the public docket.

5. The Court declares that ADOT and MVD's policy and practice of treating noncitizens holding (c)(14)-coded EADs differently than other EAD holders is preempted under the Supremacy Clause of the U.S. Constitution.

6. Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them are permanently enjoined from implementing or enforcing a policy or practice of denying deferred action recipients with (c)(14)-coded EADs the ability to present their EADs alone to establish authorized presence for purposes of qualifying for Arizona driver's licenses.

7.    The Clerk shall **terminate** this action.

Dated this 20th day of June, 2018.

David G. Campbell
United States District Judge